Mark Beliaev

3416 Lerwick Rd

Sacramento, CA 95821

(279) 265 85-17

Pro Se Plaintiff



**FILED**

APR 08 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

Mark Beliaev,

Plaintiff,

v.

U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS), and Officer Smith (full name unknown).

Defendants.

Case No.: 2:25-cv-1046-TLN JDP (PS)

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES

(Pro Se Civil Rights Complaint)

## INTRODUCTION

Plaintiff brings this action for relief against U.S. Immigration and Customs Enforcement (ICE), the Department of Homeland Security (DHS), and Officer Smith for constitutional violations related to prolonged and unjustified detention, denial of parole, and continued monitoring through a GPS device after eligibility for release under the Convention Against Torture (CAT).

## I. JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 (Administrative Procedure Act), and Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971).

2. Venue is proper in this district because the events giving rise to the claims occurred in Sacramento, California.

## II. PARTIES

3. Plaintiff Mark Beliaev resides in Sacramento, California, and was granted withholding of removal under CAT on September 30, 2024.

4. Defendant ICE is a federal agency under DHS.

5. Defendant DHS is the department responsible for ICE.

6. Defendant Officer Smith is employed at the ICE Sacramento Field Office; Plaintiff does not know his full name.

## III. STATEMENT OF FACTS

### A. Immigration Detention and Parole Denials

7. Plaintiff was detained by ICE for approximately one year and three months in Louisiana, before being released on December 13, 2024.

8. During this time, Plaintiff submitted multiple parole requests, which were denied despite meeting the criteria for release, including non-violent history, family ties, and CAT eligibility.

9. To the best of Plaintiff's recollection, parole was denied at least four times, though records were not provided by his former attorney.

10. Plaintiff waited over four months for a decision from Immigration Judge Tanya Hasbrouck, who later departed from EOIR amid misconduct allegations.

### B. Impact on Plaintiff's Family

11. Plaintiff's detention caused severe stress to his family. His mother developed heart-related health issues during this time and sought treatment from a cardiologist.

12. She was left to care alone for Plaintiff's disabled brother, further compounding the family's emotional hardship.

### C. ICE GPS Bracelet Incident

13. On March 12, 2025, Plaintiff attended a scheduled appointment with ICE Sacramento Field Office and requested removal of his GPS monitor.

14. Officer Smith responded rudely: "I don't care what you were told. I will not remove your GPS bracelet now. Your next appointment is on June 30, 2025. Goodbye."

15. Plaintiff had previously been informed that the GPS would be removed at this appointment.

16. Officer Smith did not provide any written explanation for the denial and failed to introduce himself until asked.

### D. Attempts to Seek Relief

17. Plaintiff submitted formal written requests to both ICE Sacramento and San Francisco Field Offices.

18. Plaintiff submitted two online complaints and one mailed complaint to DHS Office for Civil Rights and Civil Liberties (CRCL).

19. Plaintiff also submitted a formal complaint to the ACLU of Northern California.

20. Plaintiff contacted an ISAP worker, who stated that ICE could detain him simply for making a removal request.

21. Plaintiff delayed this lawsuit out of fear of retaliation.

22. Plaintiff experienced emotional distress, stress-related bald spots, and physical discomfort from the GPS device.

23. Plaintiff's motion to reopen his immigration case remains pending.

24. Plaintiff is a participant in a collective lawsuit against DHS before the Ninth Circuit.

25. Congressman Ami Bera's office acknowledged receiving Plaintiff's complaint and initiated an inquiry on April 3, 2025.

## IV. CLAIMS FOR RELIEF

Claim 1: Violation of Due Process (Fifth Amendment)

26. ICE's failure to remove the GPS monitor and continued detention without cause violated Plaintiff's due process rights.

Claim 2: Arbitrary and Capricious Action (APA)

27. ICE's refusal to provide written explanation or criteria for continued GPS monitoring violates the Administrative Procedure Act.

Claim 3: Bivens Claim Against Officer Smith

28. Officer Smith acted with deliberate indifference and hostility, depriving Plaintiff of constitutional rights under color of federal authority.

## V. RELIEF REQUESTED

A. Order removal of Plaintiff's GPS ankle monitor.

B. Declare ICE's continued monitoring of Plaintiff unlawful.

C. Award compensatory damages in the amount of $200,000, or such amount the Court finds just and reasonable.

D. Grant any other relief the Court deems appropriate.

Dated: 04.07.2025

Signature:

Respectfully submitted,

Mark Beliaev

3416 Lerwick Rd

Sacramento, CA 95821

marktv295@gmail.com

(279) 265 85-17

## Exhibits in Support of Complaint

### Exhibit A – Photograph of GPS Bracelet and Ankle Irritation

This exhibit includes photographs of the Plaintiff's ankle showing physical irritation and discomfort caused by the ICE-issued GPS monitoring bracelet. This supports claims of physical harm and emotional distress.

### Exhibit B – Letter from Congressman Ami Bera (April 3, 2025)

A letter from Congressman Ami Bera acknowledging that his office made an inquiry with DHS/ICE on behalf of Plaintiff. This supports Plaintiff's claim that all reasonable steps were taken prior to filing this lawsuit.

### Exhibit C – Petition Submitted to Congressman Ami Bera

A copy of the petition letter submitted to Congressman Ami Bera regarding ICE mistreatment. The letter was accompanied by signatures from other Russian nationals affected by ICE, which were mailed to the Congressman but not retained by the Plaintiff.

### Exhibit E – EOIR Case Summary Screenshot

A screenshot showing Plaintiff was granted withholding of removal under CAT on September 30, 2024, and that a Motion to Reopen was received on March 27, 2025. This demonstrates Plaintiff's status and pending immigration case.

### Exhibit F – FOIA Request Sent to ICE

A copy of the FOIA request submitted to ICE seeking the full identity of Officer Smith and records related to the March 12, 2025 appointment. This supports Plaintiff's diligence in identifying all responsible parties.

### Exhibit G – Immigration Judge Order Granting Withholding of Removal under CAT

A copy of the official order issued by the Immigration Judge granting Plaintiff protection under the Convention Against Torture (CAT), dated September 30, 2024. This confirms Plaintiff's protection status.

### Exhibit H – Formal Request to ICE Sacramento Field Office

A formal written request submitted by Plaintiff to the ICE Sacramento Field Office requesting removal of the GPS ankle monitor. This supports Plaintiff's effort to resolve the issue prior to litigation.

### Exhibit I – Formal Request to ICE San Francisco Field Office

A formal written request submitted by Plaintiff to the ICE San Francisco Field Office requesting removal of the GPS ankle monitor.

**Exhibit J – Complaints to the Office for Civil Rights and Civil Liberties (CRCL)**

Copies of two online complaints and one mailed complaint submitted by Plaintiff to CRCL. These show Plaintiff's multiple attempts to seek relief through proper administrative channels.

**EXHIBIT K - Affidavit of Mark Beliaev – Participation in Collective Lawsuit Against DHS**

This affidavit details the personal experiences of Plaintiff Mark Beliaev while in U.S. immigration detention and explains his reasons for joining a collective legal effort with other Russian nationals to challenge systemic ICE abuse and misconduct.

**Exhibit Cover Pages**

**Exhibit A**

# Photo of GPS Bracelet and Ankle Rash



**Exhibit B**

# Letter from Congressman Ami Bera

03.04.2025, 14:41                    Gmail - Representative Ami Bera responding to your message (Intranet Quorum IMA00103381)

# M Gmail

Mark Beliaev <markzv295@gmail.com>

**Representative Ami Bera responding to your message (Intranet Quorum IMA00103381)**
1 message

**Office of Representative Ami Bera(mailagent)** <CA06AB.DistrictServices@mail.house.gov>          Thu, Apr 3, 2025 at 10:33 AM
To: markzv295@gmail.com

April 3, 2025

Dear *mark,

Thank you for contacting my district office regarding your situation.

I have made an inquiry on your behalf, and my district office will be back in touch with you as soon as I receive a response. Please keep in mind that as a federal legislator, I am privileged to make inquiries on behalf of my constituents, but I am prohibited by law from dictating the outcome of those inquiries.

In the meantime, please feel free to contact my district office should you need further assistance.

Be Well,

*Ami Bera* (signature)

Ami Bera, M.D.,
Member of Congress

*If replying, please do not alter the email subject line to ensure a timely delivery.*

----------------------- Original Email -----------------------
From: markzv295@gmail.com
Sent: 4/3/2025
Subject: Follow up letter

*Mark Beliaev*
3416 Lerwick Rd
Sacramento, CA 95821

*Date* 04.03.2025

*Office of Congressman Ami Bera*
8950 Cal Center Drive, Bldg. 3, Suite 100
Sacramento, CA 95826

Dear Congressman Bera and Staff,

I hope this message finds you well. I am writing to respectfully follow up on my recent request for assistance, which I submitted to your office over a week ago regarding my ongoing supervision by ICE, including the continued use of a GPS ankle monitor despite having been granted protection under the Convention Against Torture (CAT).

As of today, I have not received a response from your office. I understand your team handles many requests, but I would be very grateful to receive written confirmation that my request is being reviewed or that any action has been taken.

03/04/2025, 14:41                    Gmail - Representative Ami Bera responding to your message (Intranet Quorum IMA0010328I)

Due to the lack of resolution and the ongoing emotional, physical  and
financial harm I continue to suffer, I am preparing to file a formal civil
rights lawsuit in federal court against ICE and involved officials. Before
moving forward, I want to ensure that I've exhausted every option and given
your office every opportunity to assist.

I greatly appreciate any effort or response your office can provide, and I
truly hope you are able to assist me in resolving this matter without
further legal claim.

Thank you again for your service and your time.

Sincerely,
"Mark Bolawn"
A-249274293

**Exhibit C – Petition Submitted to Congressman**

# Letter to Congressman Regarding Unfair Treatment by the Department of Homeland Security (DHS)

Date: 01.27.2025

Honorable **Ami Bera, M.D**
*8950 Cal Center Drive*
*Building 3, Suite 100*
*Sacramento, CA 95826*

Phone: (916) 635-0505
Dear Congressman Ami Bera,

I hope this message finds you well. My name is Mark Beliaev, and I am a constituent residing in your district. I am writing to bring to your attention an issue I experienced with the Department of Homeland Security (DHS) that has caused me significant concern and distress.

On 09.20.2023, I was detained by DHS for a prolonged period of 1 year and 3 months. During my detention, I was granted Withholding of Removal under the Convention Against Torture (CAT), yet I had to wait nearly 4 months for the judge's decision to be finalized. This experience was deeply challenging and has left me with lingering concerns about the fairness and accountability of DHS practices. Additionally, I am aware of numerous other individuals, including individuals from Russia, who remain detained even after being granted asylum or similar protections. Instead of releasing these individuals as required, DHS has appealed their cases, prolonging their detention and subjecting them to unnecessary hardship.

These actions by DHS raise serious questions about their commitment to upholding justice and respecting the rights of individuals under their jurisdiction. Such prolonged detentions, especially in cases where individuals have been granted protection or where no legitimate threat exists, are not only unjust but also inhumane. These practices have significant implications for the affected individuals and their families, both emotionally and financially.

I am reaching out to you as my representative in Congress to request your assistance in addressing this matter. Specifically, I would greatly appreciate it if you could:

1. Investigate these incidents to ensure that the actions of DHS personnel align with the principles of justice and accountability.

2. Advocate for policies or measures that prevent such prolonged detentions and ensure timely and fair resolutions for individuals in DHS custody.

3. Provide me with guidance on additional steps I can take to seek resolution or ensure that my voice is heard.

I have attached relevant documentation, including letter of the Russian opposition politician Ilya Yashin to New York Times and article from The Insider regarding of unfair deportation of Russian asylum seeker Evgeny Mashin, to provide further context for your review.

Thank you for your time and attention to this matter. I sincerely appreciate your dedication to serving our community and addressing the concerns of your constituents. Please feel free to contact me at 279 265 85 17 or marktv295@gmail.com if you require further details or clarification regarding this issue.

I look forward to your response.

Sincerely,

Mark Beliaev
3416 Lerwick Rd
Sacramento, California 95821
marktv295@gmail.com
279-265-85-17

**Exhibit D**

# Screenshot from PacerMonitor – 9th Circuit Case



**Exhibit E**

# EOIR Case Summary Screenshot



Name: BELIAEV, MARK  |  A–Number: 249–274–299  |  Docket Date: 12/18/2023

**Next Hearing Information**

*There are no future hearings for this case.*

**Court Decision and Motion Information**

The immigration judge **GRANTED** CAT Withholding.

**DECISION DATE**
September 30, 2024

**COURT ADDRESS**
830 PINEHILL ROAD
JENA, LA 71342

**MOTION TO REOPEN, IJ JURISDICTION**
A Motion to Reopen IJ Jurisdiction was **RECEIVED** on **March 27, 2025**.

**Exhibit F**

# FOIA Request Sent to ICE

05.04.2025, 16:05    Gmail - FOIA Request – Identity of ICE Officer and Records from March 12, 2025 Appointment at Sacramento Field Office

 Gmail

Mark Beliaev <marktv295@gmail.com>

**FOIA Request – Identity of ICE Officer and Records from March 12, 2025 Appointment at Sacramento Field Office**
1 message

Mark Beliaev <marktv295@gmail.com>                                  Thu, Apr 3, 2025 at 9:24 AM
To: ice-foia@ice.dhs.gov

**Mark Beliaev**
3416 Lerwick Rd
Sacramento, CA 95821
marktv295@gmail.com
(279)265 85-17

**Date:** 04.03.2025

**U.S. Immigration and Customs Enforcement**
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, D.C. 20536-5009

To Whom It May Concern,

Pursuant to the Freedom of Information Act (5 U.S.C. § 552), I respectfully request the following records:

1. The **full name, job title, and badge or employee ID number** of the ICE officer referred to as **"Officer Smith"**, who interacted with me during my scheduled appointment at the **ICE Sacramento Field Office** on **March 12, 2025.**

2. Any notes, reports, or internal communications made by or about Officer Smith related to my supervision case, including the request I made that day to remove the GPS ankle monitor.

3. Any documents, forms, or case file entries regarding the outcome or processing of my appointment on that date.

I am requesting these records in connection with my personal supervision file and due to the officer's role in decisions affecting my civil rights. I request a **fee waiver** as this information is for personal use and in the public interest, as it relates to the conduct of government officials.

Please provide the documents in electronic format if possible. If any part of this request is denied, please provide the reason for the denial and advise me of my right to appeal.

Thank you for your attention to this matter.

Sincerely,
**Mark Beliaev**
A-249274299

**Exhibit G**

# Immigration Judge's Order Granting CAT Withholding

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
LA SALLE IMMIGRATION COURT
JENA, LOUISIANA

| | | |
|---|---|---|
| Matter of: | ) | |
| | ) | |
| **Mark BELIAEV** | ) | Case No. A 249-274-299 |
| *Respondent* | ) | IJ: Hon. Tanya L. Hasbrouck |
| | ) | |
| In Removal Proceedings | ) | Date: September 30, 2024 |
| | ) | |

**ON BEHALF OF RESPONDENT**
Maria Karimova Romanyuk, Esq.
12932 S. 152nd East Ave.
Broken Arrow, OK 74011

**ON BEHALF OF THE DEPARTMENT**
Assistant Chief Counsel Myisha Davis
DHS/ICE/Litigation Unit
P.O. Box 410
Trout, Louisiana 71371

Charge: Arriving Alien:

Section 212(a)(7((A)(i)(l) of the I&N Act in that you are an immigrant
Who, at the time of application for admission, is not in possession of a valid
unexpired immigrant visa, reentry permit, border crossing card, or other
valid entry document as required by the Act, and a valid unexpired passport
or other suitable travel document or document of identity and nationality as
required under the regulations issued by the Attorney General under section
211(a) of the Act.

Applications: I-589    Asylum: Sec. 208 of the I&N Act
Withholding of Removal: Sec 241(b)(3)(A) of the I&N Act
Withholding of Removal under the Convention Against Torture:
Sec. 1208.16 of Title 8 C.F.R.

**ORAL DECISION AND ORDER OF THE IMMIGRATION JUDGE**

**I.    PROCEDURAL HISTORY**

Respondent is a native of Russia and citizen of Russia, who entered the United States on
or about Sept. 20, 2024 at or near San Ysidro, California. Ex. 1. At the time of application to
enter the United States, Respondent was not in possession of a valid unexpired immigrant visa,
reentry permit, border crossing card, or other valid entry document, and a valid unexpired passport,
or other suitable travel document, or document of identity and nationality. *Id.* The Department of
Homeland Security (DHS) served Respondent with a Notice to Appear ("NTA) on November 30,

2023 charging him with removability from the United States pursuant to section 212(a)(7)(A)(i)(I) of the INA. Respondent was placed into removal proceedings on December 14, 2023 when the Department of Homeland Security (DHS) filed a form I-861. *Id.* On February 15, 2024, Respondent, being detained and represented by counsel at that time, admitted the allegations and conceded the charge of removability pursuant to 212(a)(7)(A)(i)(I). Accordingly, the Court finds DHS established removability by clear and convincing evidence. Russia is designated as the county for removal purposes should removal become necessary.

On February 10, 2024, Respondent filed a Form I-589 Application for Asylum and Withholding of Removal with an amended I-589 being filed on May 24, 2024. Exh. 2. The bases for removal being sought are on grounds of political opinion and membership in a particular social group. *Id.* In his application, Respondent also requested protection under the Convention Against Torture (CAT). *Id.* On May 24, 2024 and June 4, 2024, Respondent appeared before the Court with counsel, for his individual hearing on the merits of his I-589 application. At the conclusion of the hearing, the Court reserved decision.

## II.    EVIDENCE PRESENTED

All evidence of record has been considered by the Court whether specifically mentioned in the text of this decision. See 8 C.F.R. § 1240.1(b). All evidence was entered without objection. Respondent testified at the hearing, and called Igor Kotler as an expert witness. The testimony is incorporated into the Court's decision to the extent it is relevant to the Court's analysis.

### A. Documentary Evidence

Ex 1    I-862 Notice to Appear;
Ex. 2    Respondent's Evidence Part 7 (filed 5/24/2024)
      Tab A: R's personal statement (pp 4-6)
      Tab B: Amended I-589 (pp 8-19)
Ex. 3    Respondent's Evidence Part 1 (filed 5/8/2024) (134 pages);
      Expert Witness Report
Ex. 4    Respondent's Evidence Part 2 (filed 5/10/2024) (43 pages)
      Index
      Tabs A-H
Ex. 5:    Respondent's Evidence Part 4 (filed 5/10/24) (82 pages)
      Tabs R-JJ
Ex. 6:    Respondent's Evidence Part 3 (filed 5/10/24) (158 pages)
      Tabs I-Q
Ex. 7:    Respondent's Evidence Part 5 (filed 5/10/24) (26 pages)
      Tab A: R's declaration
      Tab B: Respondent's amended I-589 statement
Ex. 8:    Respondent's Evidence Part 5 (filed 5/15/24) (77 pages)
      Tabs A-N
Ex. 9: I-589 affirmation 5/24/24

EOIR - 2 of 26

- 2 -

### IV. SUMMARY OF FACTS

*This is a summary of the facts and testimony. It is not intended to be a verbatim record of the testimony.*

Respondent is a 21 year old male who is a native and citizen of Russia who is single, and has no children. Respondent's mother and siblings also are from Russia, but are in the United States also seeking asylum. Respondent's father is in Russia.

Respondent's mother applied for asylum in the U.S., when the Respondent was 20 y.o., and Respondent was included as a dependent on the M's application. See Exh. 5, Tab Z at 34-46. Since turning 21, the Respondent has now submitted his own application. Ex. 2 at 7-19 .

Respondent is seeking asylum or withholding of removal based on political opinion and membership in particular social groups. Ex. 2 at 12. The PSG articulated by Respondent, through his counsel in this case includes: family members of people with disabilities. Respondent also argues that he has a political opinion of being a pro-government activist who is opposed to Russian authorities.

Respondent asserts that he has been harmed in Russia due to discrimination against him for having a brother who is disabled. Respondent's brother has cerebral palsy and spastic hemiplegia. Respondent has been helping his mother , who is a single parent, care for his brother since his brother was a child. See Ex. 7, Tab A.

When growing up, at school and in Respondent's neighborhood, students and neighbors knew Respondent had a brother with disabilities. People would bully both Respondent and his brother, and would call them names. Ex. 7 at 5-6. In May, 2017, Respondent was assaulted after defending his brother from two teens who were calling him names and chasing them away from a playground. Respondent's index finger was broken during the assault. *Id.* at 15-16. Respondent's mother took him to the hospital, and a cast was put on his arm. Respondent's mother filed a report against the teens, but the police did not accept the case. Ex. 7.

In December, 2018, Respondent was involved in another altercation when he and a student had an argument after the student said Respondent was the brother of a cripple, to which Respondent replied he was a person with disabilities. Ex. 7 at 21 (21 of 98). Respondent said the student punched, kicked, and beat him until he lost consciousness. As a result Respondent says he was diagnosed with a head concussion, a severe chest contusion, and a head contusion. *Id.* at 6-7. Respondent's mother took him for a forensic examination which Respondent says confirmed that he had a head concussion, and contusion to his head and chest. *Id* at 7.

Respondent and his mother went to the police station to file criminal charges, but the police refused to initiate a criminal case due to the age of the person who assaulted Respondent being 14 years old. Ex. 7. Respondent's mother complained to the school director, who was unsympathetic and told her that, as she is a divorced woman in Russia with a disabled child, that she needed to get used to people having that attitude towards her and her children. *Id.* Respondent's mother

- 3 -

EOIR - 3 of 26

then wrote a Complaint to the prosecutor's office of the Kalinisky district, but they refused to initiate a criminal case. Id; Ex. 8 at 9.

Respondent asserted that due to the stress and beating that he began to have heart problems in the form of arrythmias, which led to him having to stop playing football, which was a sport that he loved. Ex. 7 at 7.

Respondent says, as a result, he also had to change schools and place of residence because of the persecution of the 14 year old minor. Respondent and his family moved to SNT (Garden Non-Profit Partnership) Neftyanik 1. *Id.* Respondent studied at his new school from September 2019 to June 2021, but says he was subjected to persecution there too by people who hated his brother because he was a person with disabilities. *Id.*

In January 2021, Respondent had a disagreement with a neighbor who lived next door to him who was a police officer. The neighbor had parked his vehicle near the exit from Respondent's house. Respondent asked him if he would move it so Respondent could take his brother for a walk in his stroller. The neighbor refused. Respondent tried to go past the car with the stroller when the neighbor grabbed it and the stroller which caused Respondent's brother to fall to the ground. The man grabbed the Respondent by the neck and struck him in the stomach asking if he also wanted to become disabled. Respondent and his brother both started crying. Another neighbor assisted the Respondent to get him and his brother home. *Id.* at 8.

The next week, the Respondent and his mother went to the police department, and wrote a complaint. The officer on duty knew the other officer, and asked were they not ashamed to complain about him. The officer then began to threaten Respondent's mother with reprisals against the family, and then ordered Respondent and his mother to leave. *Id.*

At the end of January 2021, the Telegram channel, which is an opposition channel, announced mass peaceful demonstrations to protest against the illegitimate court decision against Alexei Navalny, who at that time was already imprisoned by Russian authorities. *Id.* Respondent testified that he joined the demonstrations with three of his friends in the city of Ufa. While chanting "Freedom for Navalny, Respondent was struck three times by officials with a baton, and they also twisted his hands. Respondent was then handcuffed and detained in a police wagon for several hours, and then taken to a police station. *Id.* at 9. Respondent was not interrogated, but his internal passport information was written down. Respondent was placed in a dark cell without food, water, or toilet until the next morning when he was released. *Id.*

In March, 2021, Respondent's mother wrote about the abuse by police officers, mentioning the incident with his brother, the Respondent's detention, and stating how the police refused to help them protect their basic human rights, which she said were constantly violated in Russia. Ex. 7 at 9; Ex. 8 at 10. Respondent reposted his mother's message on his social media page on VKontakte. *Id.* Respondent says he received complaints from people who were pro-government activists, and received threats to his life and freedom from unknown persons. *Id.* Then, his posts were blocked. *Id.*

In July 2021, a local police officer, Ramis Akhmadullin, showed up at Respondent's police registration address and asked Respondent to give up his passport and accompany the officer to the police station. Ex. 7 at 9-10. Respondent's mother and brother were not home. *Id.* ; Ex. 8 at 10. Respondent was put in a cell, and that night was taken to an interrogation room where he was beaten for having criticized the authorities. Ex. 7 at 10.

Respondent said the officer knew about Respondent's prior detention related to his participation in the Navalny protest in January 2021, and about the complaints Respondent's mother had filed with the police. After being beaten for a few hours, the Respondent was placed back in his cell. The next day, Respondent was released with a warning to stop protesting against the authorities or he would be imprisoned for a long time. *Id.*

Respondent's mother called an ambulance, but Respondent says it took too long, so she called a friend, Ksenia Konova, who worked at a local hospital, who examined the Respondent and prescribed medications for the Respondent in the form of painkillers and sedatives. *Id.* Then, the ambulance arrived, and a doctor examined the Respondent. But, when Respondent told him he had been beaten by the police, the doctor collected his belongings and told the Respondent if it gets worse, he should go to the hospital. Respondent remained at home being treated by his mother's friend. R said he had nightmares after that fearing the police would come again for him. He also says his vision deteriorated, and he was under a lot of stress. *Id.* at 11.

On August 23, 2021, the Respondent left Russia for the Czech Republic to attend school. *Id.* at 26. In February, 2022, while in the Czech Republic, the Respondent obtained a part-time job. *Id.*

In February 2022, Russia invaded Ukraine. Respondent stated that he participated in a peaceful rally in support of Ukraine, and then gave 100 Czech crowns, which is the equivalent of $5.00, to a Czeck fund to help Ukraine. *Id.*; Ex. 8 at 65. Respondent says he transferred more small amounts to the same fund when he could afford it. *Id.* at 11. However, Respondent did not provide any additional receipts demonstrating that he donated more than the one $5.00 contribution.

On March 6, 2022, Respondent participated in a peaceful march against the war in Ukraine and the power of President Vladimir Putin. Respondent wrote a poster that said "No to War". *Id.* Respondent says there were several suspicious young people at the rally filming the participants and taking photos. *Id.* Respondent says he also spoke out against the war through social media networks, primarily Instagram. *Id.*

Respondent applied for admission to the University in the Czech Republic, but was rejected due to sanctions against Russia. Respondent appealed, but that was also rejected. *Id.* Then, Respondent then lost his part-time job because his residency permit was not renewed, so he no longer had work authorization. *Id.* at 12.

In the summer of 2022, Russia passed legislation making it illegal to provide financial assistance to any unfriendly countries and its citizens. *Id.* .

- 5 -

On March 6, 2022, Respondent participated in a peaceful march of Russian citizens against the war in Ukraine. Respondent wrote on a poster "No to War?".

On March 10, 2022, Respondent was having dinner with two Russian-speaking friends in the Czech Republic. After asking for a menu, the manager demanded they leave as Russians were not served at that restaurant. *Id.* Respondent tried to explain, but the manager slapped him in the face. One of Respondent's friends was also hit in the stomach, and they were thrown out of the restaurant. *Id.*

In April 2022, a police official came to Respondent's mother's home in Ufa looking for the Respondent. *Id.* at 13. In September 2022, a military registration and enlistment office worker came to Respondent's mother's home also looking for the Respondent to give him a summons. Respondent's mother refused to sign the summons. The officers threatened Respondent's mother with imprisonment and to send Respondent's brother to an orphanage if she did not present the Respondent soon. *Id.*

In October 2022, a district police officer, Ramis Akhmadullin, came to Respondent's mother's house looking for Respondent. He told Respondent's mother that Respondent continued his opposition activities in the Czech Republic and posted against the war. *Id.* The officer went to neighbors of the Respondent telling them the Respondent was an oppositionist and his mother was a "razvedenka" , or a divorcee. The officer ordered the neighbors to inform him if the Respondent appeared at his home. *Id.*

Respondent testified that he also has been attacked and threatened in the Czech Republic by a Ukranian family for being Russian. *Id.* Respondent stated he called the police, but they did not come because they heard the Respondent's Russian accent and ordered him to resolve personal matters himself. *Id.* Respondent was afraid to leave his dorm room. *Id.*

In 2023, police officers again came to Respondent's mother's house looking for Respondent, and threatened her with prison if Respondent did not stop speaking out against the war and criticizing Russian authorities. *Id.* Respondent's mother said they came regularly and made threats of prison if Respondent did not quit speaking out against the war and criticizing the Russian government. *Id.* On July 21, 2023, Respondent's mother fled from Russia with Respondent's brother. Respondent was in the country of Georgia at the time. He met up with his mother and brother in Instanbul, Turkey, and then they all fled to the United States. Ex. 7 at 13-14; Ex. 8 at 12.

Respondent says that on December 5, 2023, the police officer, Ramis Akhmadullin, called his mother through online messenger, Telegramm, asking about the Respondent. Ex. 7 at 14; Ex. 8 at 13.

Respondent fled to the United States because he fears for his life and freedom in Russia due to his political opinion and being a member of the particular social group of families of disabled persons, and cannot return to the Czech Republic as he does not have residency, has no work authorization, and faces threats, harm , and discrimination in the Czech Republic due to being

- 6 -

Russian.

Efim Alania, one of Respondent's neighbors from Czech republic submitted a statement confirming the incident at restaurant on March 10, 2022 ; the incident with the Ukrainian man; and that the Czech police do not help "immigrants where ethnic conflicts occur". Ex. 8 at 38-39. This witness further says he witnessed Respondent's experiences with nationalism, and disused Respondent's visa extension being denied. *Id.* This is the person the Respondent went with to Georgia when he left the Czech Republic. *Id.* Respondent also submitted other additional statements from neighbors and friends to confirm portions of his testimony. *See* Ex. 8, Tabs B, C, and D.

### *Summary of Expert Witness Testimony and Report*

Respondent presented an expert witness, Igor A. Kotler, C.Ph., to testify and for submission of his expert report. *See* Ex. 3. An expert is defined "as someone who 'is qualified as an expert by knowledge, skill, experience, training, or education.'" *Matter of D-R-*, 25 I&N Dec. 445, 459 (BIA 2011) (quoting Fed. R. Evid. 702), remanded on other grounds, *Radojkovic v. Holder*, 599 F. App'x 646, 648 (9th Cir. 2015). An expert may make reasonable inferences based on facts and data. *Matter of D-R-*, 25 I&N Dec. at 460 (citing Fed. R. Evid. 703). An Immigration Judge should only find an expert's opinion to be persuasive if there is a reliable factual or evidentiary basis for his or her conclusions. *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003). While an expert witness can be found credible, that does not mean the Court is required to "accept all the testimony and opinions provided as facts." *Martinez-De-Uma et al v. Garland*, No. 22-60340 (5th Cir. Sept. 8, 2023) (citing *Matter of M-A-M-Z*, 28 I&N Dec. 173, 177 (BIA 2020).

In this case, the DHS did not object Dr. Kilgore being designated as an expert in this case. The expert provided testimony and evidence concerning the regime in Russia, corruption and political corruption in Russia, torture in Russia, Anti-Americanism in Russia, nationalism in Russia, and his expert opinion. The Respondent's expert's testimony and legal memorandum is probative and persuasive as to issues in this case, and particularly of whether Russian government's actions toward Respondent rise to the level of persecution and/or torture in this case. The expert, however, also rendered opinions as to whether the Respondent would be targeted due to having a brother who was disabled. The Court did not find the expert's opinion to be persuasive or that he submitted any reliable factual or evidentiary bases for his conclusions that Respondent would be targeted due to having a disabled brother. Accordingly, the expert's opinion is not accepted as to this portion of his opinion. Appropriate weight is accorded to the remainder of D. Kotler's testimony and opinion. *See* Ex. 3.

### V. LAW AND ANALYSIS

#### A. Credibility and Corroboration

Before determining whether the applicant meets the statutory criteria for the requested relief, the Court should address his or her credibility. *See Chun v. INS*, 40 F.3d 76, 79 (5th Cir. 1994); *see also Zhang v. Gonzales*, 432 F.3d 339, 345 (5th Cir. 2005). Applications for relief made

- 7 -

on or after May 11, 2005, are subject to the credibility assessment standards articulated in the REAL ID Act. *Matter of S-B-*, 24 I&N Dec. 42 (BIA 2006).

A credibility finding may be based on the demeanor, candor, or responsiveness of the applicant; the inherent plausibility of the applicant's account; the consistency between the applicant's written and oral statements; the internal consistency of each statement; the consistency of such statements with other evidence of record; any inaccuracies in such statements; or any other relevant factor. INA § 240(c)(4)(C). Where corroborative evidence is available, such evidence should be presented. INA § 208(b)(1)(B)(ii); *Matter of Y-B-*, 21 I&N Dec. 1136, 1152 (BIA 1998).The provisions of the REAL ID Act apply to Respondent's application because he filed it after May 11, 2005. Exh. 3.

The testimony of an applicant alone may be sufficient to sustain his or her burden of proof without additional corroboration, but only if this testimony is "credible, is persuasive, and refers to specific facts to demonstrate that the applicant is a refugee." INA §§ 208(b)(1)(B)(ii), 241(b)(3)(C), 240(c)(4)(B). The Act explicitly distinguishes between each of these three requirements. *See Garland v. Ming Dai*, 593 U.S. 357; 141 S. Ct. 1669, 1680 (2021). An immigration judge may "credit part of [a] witness' testimony without necessarily 'accepting it all'". *Ming Dai*, 593 U.S. at 366 (quoting *Banks v. Chi. Grain Trimmers Ass'n*, 390 U.S. 459, 467 (1968)). "The absence of a clear adverse credibility finding does not mean the respondent's testimony must be deemed objectively true." *Matter of H-C-R-C-*, 28 I&N Dec. 809, 811 (BIA 2024) (citing *Ming Dai*, 593 U.S. at 365-66) (explicitly rejecting the "deemed-true-or-credible rule"). Thus, even if a respondent's evidence is credible, it may not be persuasive. *Id.*, 28 I&N Dec. at 811-12 (citing *Ming Dai*, 593 U.S. at 371).

If the Court is satisfied that the applicant's testimony is "credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant has satisfied [his or her] burden of proof," corroboration is unnecessary. INA § 240(c)(4)(B). Nevertheless, the Court may require the applicant to corroborate otherwise credible testimony where such evidence is reasonably obtainable. *Rui Yang v. Holder*, 664 F.3d 580, 586 (5th Cir. 2011) (finding that an applicant's credible testimony alone may be sufficient to sustain his or her burden of proof "'*only if corroboration is not reasonably available*'") (quoting 8 C.F.R. § 1208.13(a)) (emphasis in original). Due to Respondent's unpersuasive testimony, the Court requires further corroboration.

Under section 208(b)(1)(B)(iii) of the Act, an Immigration Judge may base a credibility finding on, among other factors, "the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements . . . , the internal consistency of each such statement, the consistency of such statements with other evidence of record . . . , and any inaccuracies or falsehoods in such statements." Thus, consideration of inconsistencies, whether occurring in testimony or between testimony and other evidence, is a fundamental component of an adverse credibility determination. See *Dayo v. Holder*, 687 F.3d 653, 657 (5th Cir. 2012); *Hong Fei Gao v. Sessions*, 891 F.3d 67, 77–79 (2d Cir. 2018). An inconsistency need not go to the heart of the claim, and "an [Immigration Judge] may rely on any inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible." *Wang v. Holder*, 569 F.3d 531, 538 (5th Cir. 2009) (emphasis omitted) (quoting *Lin v. Mukasey*, 534 F.3d 162, 167 92nd Cir. 2008); *see also, id.* at 539 (adopting Second Circuit's standard)."

- 8 -

The Court carefully observed Respondent's demeanor, candor and responsiveness, and analyzed his testimony, his declaration, and the evidence submitted for consistency, detail, specificity, and persuasiveness. Considering the totality of the testimony and evidence, and after careful consideration of the facts of record individually, as well as cumulatively, the Court finds that Respondent was a credible witness in certain areas, but was not credible in others as some of his testimony was not plausible. Despite this, overall, Respondent's testimony was credible and the Court declines to make an adverse credibility finding. The Court will, however, give reduced weight to the Respondent's testimony and declaration and to the Respondent's mother's statement which pertain to portions that are not plausible, which are discussed *infra*. As to the other the testimony and evidence, full weight shall be given if consistent, and appropriate weight shall be awarded to any testimony and/or evidence that is consistent and/or persuasive.

Testimony and evidence which the Court found to be unpersuasive includes the description of injuries allegedly sustained by Respondent in a physical altercation of December, 2018, wherein after Respondent had an altercation with a student after the student said Respondent was the brother of a cripple, to which Respondent replied he was a person with disabilities. *See* Ex. 7 at and wherein Respondent said he was punched, kicked, and beat until he lost consciousness, after which he says he was diagnosed with a head concussion, a severe chest contusion, and a head contusion, and Respondent's mother took him for a forensic examination which R says confirmed that he had a head concussion, and contusion to his head and chest. *Id.* at 6-7. Respondent did not submit any medical documentation demonstrating that he sustained the injuries described by him and his mother, and the Court finds this evidence would have been reasonably available to Respondent and was not obtained. As such, the Court gives testimony of the injuries allegedly sustained reduced weight.

The Court further finds unpersuasive Respondent's testimony that due to stress and a beatings which Respondent incurred that he began to have heart problems in the form of arrythmias, which led to him having to stop playing football, which was a sport that he loved. Ex. 7 at 7. The credible testimony and evidence did not sufficiently demonstrated the Respondent sustained these injures or that this led him to have to stop playing football.

Respondent also stated that he and his mother went to the police station to file criminal charges related to this incident, but the authorities refused to initiate a criminal case due to the age of the attacker being 14 years old. Ex. 7; Ex. 8 at 8-9. Respondent's mother complained to the school director, who was unsympathetic and told her that, as she was a divorced woman in Russia with a disabled child, that she need to get used to people having that attitude towards her and her children. *Id.* Respondent's mother then wrote a complaint to the prosecutor's office of the Kalinsky district, but they refused to initiate a criminal case. *Id*; Ex. 8 at 8-9. The Court does not find this testimony and evidence persuasive that the police refused to assist the Respondent and/or his mother due to the Respondent's brother being disabled, Respondent having a political opinion, or any other reason other than the age of the person who allegedly assaulted the Respondent.

The Court finds Respondent's testimony and statement that he began to have heart problems in the form of arrythmias due to the stress unpersuasive and implausible. There also was no corroborating evidence other that his mother's statement, and the Court also observes in her statement that she also claim to have begun to have heart problems as a result of the incident,

- 9 -

which is unpersuasive and implausible.  As there was no credible corroborating medical documentation or other evidence to support what Respondent's contention and/or his mother's contention, the Court gives the testimony of the altercation having caused Respondent to have heart problems no weight.

Respondent also testified to another incident which occurred in July 2021 which Respondent claims caused his vision to deteriorate.  The testimony of this claim also is unpersuasive, does not ring true, and the Court finds it implausible that the incident would cause his vision to deteriorate.  Respondent submitted no medical documentation or other credible corroborating evidence, and the Court gives Respondent's claim of vision deterioration no weight.

The Court further finds unpersuasive the Respondent's testimony and written statement and his mother's statement that Respondent was detained and harmed for reposting his mother's online post concerning opposition activities.  The Court observes that no mention by Respondent or his mother of his mother ever being detained or interrogated even though she also was the one who originally made the post. *See* Ex. 8 at 10.  The Court finds it unlikely that only Respondent would be detained for reposting his mother's post, but she would not also be detained.  As such, the Court gives this testimony little weight.

Respondent also testified and provided a written statement that in March 2021, after reposting his mother's post, on his social media network that he received complaints form pro-government activists and then, at the request of Roskomndzor that his posts were blocked, but that Respondent still received several threats addressed to him from unknown persons.  Respondent did not provide a copy of any of the alleged threats.  He also did not indicate how he is aware that it was at the request of Roskomndzor that his posts were blocked.  While it could be at the request of the person, it also could be other administrative agents.  As such, the Court gives Respondent's testimony and statement little weight to the speculative portion of this statement.  Further, the Court gives reduced weight to Respondent's contention that he received several threats from unknown persons addressed to him as this evidence would have been reasonably available to Respondent and was not submitted as evidence.  Accordingly, the Court finds that Respondent did not sufficiently demonstrate that he received threats addressed to him related to his online posts.

Respondent claims that on March 6, 2022, while he lived in the Czech Republic, he attended a rally against the war in Ukraine and against the Russian regime.  Respondent claims he had a poster on which he wrote the slogan "No to War". Ex. 7 at 11.  Respondent stated that there were several suspicious people at the rally who were filming the faces of participants with phone cameras and making photos. *Id.*  Respondent states that he spoke out against the war with Ukraine through social media accounts, mainly Instagram. *Id.*  Respondent only produced one document evidencing that he made any social media posts which was a picture from his phone showing a post of a picture saying "No to War!". Ex. 5 at 78-79.  It is speculative that persons in the Czech Republic took his picture and sent it to Russian authorities.  As such, the Court gives this inference made by Respondent little weight.

The Court further finds unpersuasive the Respondent's testimony and statement that in October 2022 a district police officer, Ramin Akhmadullin, talked to his mother telling her that Respondent was continuing his opposition activities in the Czech Republic and post[s] against the war, and "in 2023, police officers again started coming to [his] mother with threats of prison if

- 10 -

[he] did not stop speaking out against the war and criticizing the Russian authorities. *See* Ex. 7 at 13. It seems unlikely, implausible, and does not ring true that during the war going on in Ukraine, and the numerous frequent protests in Russia, that an officer in Russia is going to know what the Respondent, who was not yet even twenty years of age, was doing in the Czech Republic. Further, the Respondent only provided one post that was allegedly reposted. If Respondent had further posts to demonstrate his alleged political opposition, it was not submitted as evidence. Respondent did not sufficiently demonstrate that the police were going to him mother asserting that Respondent was an oppositionist.

Further, witness Lyubov Tulupova, only mentioned one incident where an officer came to her in October 2022 asking about the Respondent's whereabouts and emphasizing Mark's opposition to authorities and suggesting the [his mother's] parenting contributed to [Respondent's] dissent. " Ex. 8 at 23. This witness' testimony does not demonstrate that the local police were aware of Respondent's activities in the Czech Republic, rather it weighs more towards that they are following up on Respondent's earlier activities in Russia, and were looking for Respondent related to the military summons for conscription.

Witness Leonid Shpak is a neighbor of Respondent who indicates that Respondent's mother and Respondent are "outspoken critics of the Russian authorities and do not support President [ ] Putin's regime. This witness states that the Respondent served in protests against the government "both within Russia and abroad", but does not state whether he was actually present and saw Respondent or whether someone told him this. Further, Respondent did not testify to participating in protests abroad.

The witness also indicates that Respondent's mother has been active expressing her dissent online. This witness also states that Respondent's mother was subjected to interrogations in addition to Respondent. Ex. 8 at 28. Mr. Shpak does not indicate how he is aware of this, but it appears that this would have been told to the witness by another person. The Court notes that Respondent's mother did not indicate in her statement that she was detained or interrogated concerning her online activities.

This witness further indicates that in April 2022, a local police inspector came to Respondent's residence wanting information about the Respondent's whereabouts and activities, and in September 2022 that personnel from the military registration and enlistment office came looking the Respondent to issue him a summons, and talked to neighbors for information about the whereabouts of the Respondent, and that Respondent's mother refused to sign the military registration and enlistment office's summons. Ex. 8 at 28.

Then, in October 2022, Mr. Shpak indicated that officer Ramis Akhmadullin visited his home looking for Respondent and mentioned Respondent and his mother's oppositionist views, and criticized the mother for raising Respondent to oppose authority rather than instilling obedience to the authorities. Ex. 8 at 28-29.

The witness then says starting in 2023 that Respondent's mother faced threats of imprisonment from police officer if Respondent did not cease his public criticism of the war with Ukraine and the Russian authorities. The witness again does not say where he obtained this

- 11 -

information, and was not produced to testify. It does not appear that this is based on personal knowledge of the Respondent as he does not indicate that he was present when the threats were allegedly made. As such, the Court shall accord reduced weight to portions of Respondent's statement that do not sufficiently demonstrate were based on incidents actually occurring in his presence.

As to the statement of Ksenia Konova, who is a nurse who knows the family due the her employment at Children's Hospital where the children were registered, the Court also notes that portions of her statement also appear to be based on hearsay and not on incidents that she actually saw or heard. For example, the witness stated that [d]ue to persecution by homophobes at School 111, Marke's mother had to change her residence." Ex. 8 at 33. This witness fails to state how she would have become aware of this information. As such, the Court accords reduced weight to portions of the statement which do not sufficiently demonstrate that they are based on the Respondent's personal knowledge. As to the witness' examination of the Respondent in July 2021 where she observed bruises and abrasions in various parts of this body, Respondent being visibly upset, Respondent having difficulty sleeping, and complaining of poor vision[1], the Court accords the statement great weight. *Id.* at 34-35.

The Court further gives reduced weight to the end of the Respondent's statement where she mentions provides here statement that she is reporting "widespread chaos and lawlessness in Russia[, where] basic human rights are disregarded, corruption is rampant in hospitals [ ]. lacking essential medicines and equipment[, and g]overnment critics face severe repercussion including detention, torture, rape, imprisonment, and death." Ex. 8 at 34. The witness provides no basis for her claimed knowledge of this, whether she or her family have experienced any repercussions, or how this relates to her examination or treatment of the Respondent. Without more, the Court does not find this statement persuasive, and gives it little weight.

Despite the credibility and plausibility issues mentioned above, what does ring true and the Court finds credible and corroborated is that Respondent has a brother who was disabled. In December 2018, he was in an altercation at school with another minor where Respondent sustained injuries, including a fractured finger. In 2021, Respondent had a run-in with a neighbor who is a police officer, over a parking dispute, which resulted in Respondent being assaulted by the neighbor. However, the assault was not in the officer's official capacity. The Respondent and his mother wrote a complain about the officer, after which Respondent's mother was threatened with reprisals against the family and was ordered to leave. In January 2021, Respondent attended a political rally during which he was struck with a baton three times on his body and had his hands twisted. Respondent was handcuffed with other for several hours, and then taken to various police departments. Respondent's personal information was taken from his passport and he was detained in a small, dark cell, and was not provided food, water or a toilet until the following morning around 7-8 a.m. when Respondent was released.

In March 2021, Respondent made one repost of his mother's post following which Respondent's account was blocked. In July 2021, an officer came to Respondent's home and requested his internal passport. Respondent was taken in to a police department, and was again

---

[1] The Court notes that the witness is not a doctor and makes no diagnosis that the complaint of poor vision is related to the incident where he was beaten or whether it continued.

detained. Respondent was beat by an officer with hands and fists, with the officer telling Respondent who was he to criticize authorities. Respondent was threatened not to complain or speak out against the police and authorities or they would put him in prison for a long time.

On August 23, 2021, Respondent left Russia for the Czech Republic where he enrolled in classes. In February 2022, Russia invaded Ukraine. The Respondent attended a rally and transferred 100 Czech crown (approximately $5.00) from his credit card to help Ukraine and Ukrainian refugees to a Czech fund. Ex. 8 at 65. Respondent allegedly made other transfers, but again did not provide a copy of the alleged transactions. The Court notes that Respondent was in the Czech Republic to attend school, and he was working part-time. The Court finds the record is not sufficiently persuasive to demonstrate that Respondent provided repeated contributions to a Czech fund to assist Ukraine or, assuming he did, that Russian authorities would be aware of it. While Respondent did provide a copy of his credit card, he only provided copy of the $5.00 contribution but not any other contributions. These documents would have been reasonably available to Respondent, and, as such, the testimony and evidence does not sufficiently establish that Respondent made the additional contributions other than $5.00. As such, the testimony is given little weight.

In summary, based on the Respondent's demeanor, candor and responsiveness during his testimony, and after careful consideration of the facts of record individually, as well as cumulatively, the Court finds that Respondent was a credible witness in certain areas, but some of his testimony was not persuasive, did not ring true, and was implausible. As such, the Court requires corroborative evidence. Considering the testimony and evidence as a whole the Court again finds that some portions of the testimony was sufficiently corroborated, while other portions discussed *supra* were not sufficiently corroborated. Portions of the testimony was credible, some speculative, some unpersuasive, and some implausible. As such, the Court will give reduced weight to Respondent's testimony and declaration as well as to the witness statements which pertain to speculative, unpersuasive and/or implausible portions. As to the remaining testimony, full weight shall be given if consistent and/or probable. Appropriate weight shall be awarded to any testimony and/or evidence that is inconsistent and/or unpersuasive.

## B. ASYLUM

To qualify for asylum under sec. 208 of the Act, an applicant must show that his application was timely filed; he is not statutorily barred from relief; he is a refugee within the meaning of sec. 101(a)(42)(A) of the Act; and he merits asylum as a matter of discretion.

### 1. Arriving Alien

Respondent is charge in the Notice to Appear as an Arriving Alein. Ex. 1. Respondent has the burden to "prove that he is clearly and beyond doubt entitled to be admitted to the United States and is not inadmissible as charged." 8 C.F.R. § 1240.8.

### 2. Refugee Status

A "refugee" is "any person . . . who is unable or unwilling to return to . . . [his] country because of persecution or a well-founded fear of persecution on account of [a protected

- 13 -

ground]." Id. § 1101(a)(42). Asylum is available to a "refugee" at the discretion of the government. 8 U.S.C. § 1158(b)(1).

### 3. Statutory and/or Procedural Bars

DHS raised no bars in this case with the exception of firm resettlement. A non-citizen is considered to be firmly resettled if, after the events giving rise to the noncitizen's asylum claim: (1) the noncitizen resided in a country through which he or she transited prior to arriving in or entering the United States and

> (i) Received or was eligible for any permanent legal immigration status in that country;
> (ii) Resided in such a country with any non-permanent but indefinitely renewable legal immigration status (including asylee, refugee, or similar status but excluding status such as of a tourist): or
> (iii) Resided in such a country and could have applied for and obtained any non-permanent but indefinitely renewable legal immigration status in that country.

8 C.F.R. § 208.15. Additionally, firm resettlement can be established if the noncitizen physically resided voluntarily in any one country for a year or more after departing his country, and did not continue to suffer persecution or torture.

A firm resettlement determination allows for consideration of direct and indirect evidence regarding the existence of an offer of permanent resettlement. See *Matter of A-G-G*, 25 I&N Dec. 486 (BIA 2011). DHS bears the burden of presenting prima facie evidence of an offer of firm resettlement. *Id.* at 502. Direct evidence may consist of documents such as governmental documents showing refugee status, a passport, a travel document, or other evidence indictive of permanent residence. *Id.* at 501-02. Indirect evidence may consist of immigration laws or the refugee process of the country of the proposed resettlement; the length of the noncitizen's stay in that country; the noncitizen's intent to resettle there; family, business or property connections; social and economic ties to the country; receipt of governmental benefits or assistance; and whether the noncitizen has the right to work and to exit and reenter the country. *Id.* at 502. The existence of a legal mechanism by which the noncitizen can obtain permanent residence may be sufficient to make a prima facie showing of an offer of permanent resettlement. *Id.*

In the instant case, Respondent left Russian and relocated to the Czech Republic on August 23, 2021. Respondent was testified that he lived there until he went to the country of Georgia with a friend, and the traveled through Turkey, France, Cuba and Mexico before entering the United States, using the CBP one app.

The testimony evidence indicated that Respondent was in the Czech Republic to study and not for permanent residency, and he did not apply for asylum. Although Respondent could have applied for asylum in Czech Republic, the testimony and evidence was insufficient to demonstrate that Respondent would have obtained asylum status or could have obtained permanent residency had he applied. There also was no submission of evidence by the DHS demonstrating the legal mechanism by which Respondent could have obtained permanent residence. Without more, the Court finds that the DHS did not make a prima facie case that Respondent was firmly resettled in

the Czech Republic. Based on the foregoing , there are not statutory or procedural bars to asylum in this case.

### 4. Protected Grounds

To be eligible for asylum under section 208 of the Act, an applicant must show that he is unable or unwilling to return to his or her country because of past persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group or political opinion. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). The applicant must establish that one of the five grounds was or will be at least one central reason for persecuting the applicant. *Shaikh v. Holder*, 588 F.3d 861, 864 (5ᵗʰ Cir. 2009). Due to the Court having found no firm resettlement, the Court shall address this issue as to only Russia. In this case, the Respondent, in his I-589 application asserted the protected grounds of particular social group and political opinion. Ex. 2 at 4.

#### a. Particular Social Group

It is the asylum applicant's burden to clearly articulate all potential particular social groups. *Cantarero-Lagos v. Barr*, 924 F.3d 145, 148 (5ᵗʰ Cir. 2019); *Matter of W-Y-C & H-O-B* , 27 I&N Dec. 189, 191 (BIA 2018). The Court considers each group separately to determine whether the particular group is one that "is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Jaco v. Garland*, 24 F.4th 395, 403 (5th Cir. 2021). A social group must "exist independently of the persecution." Id. at 403 (quoting Matter of M-E-V-G, 26 I &N Dec. 227, 236 n.11 (BIA 2014)). This requirement "means that the group must be sufficiently defined and particularized by characteristics other than persecution." *Jaco*, 24 F.4th at 403. A particular social group must be defined by characteristics that provide a clear benchmark for determining who falls within the group. The group must also be discrete and have definable boundaries. It must not be amorphous, overbroad, diffuse, or subjective. *Matter of M-E-V-G*, 26 I&N Dec. 227 (BIA 2014). "The common characteristic that defines the group must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. *Matter of M-E-V-G*, 26 I&N Dec. 227 (BIA 2014).

The "particularity" requirement requires that the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a distinct class of persons." *Orellana-Monson v. Holder*, 685 F.3d 511, 519-21 (5ᵗʰ Cir. 2012) (holding that "men who … refused to join [a gang]" lacked particularity because the group was "exceedingly broad" and "encompass[ed] a diverse cross section of society"); *see also Hernandez-de la Cruz v. Lynch*, 819 F.3d 784, 786-87 (5ᵗʰ Cir. 2016). To be cognizable, a particular social group must "exist independently" of the harm asserted in the application for asylum. *W-G-R-*, 26 I&N Dec. at 215 (cites omitted). Further, the proposed particular social group must be "defined by characteristics that provide a clear benchmark for determining who falls within the group." *Id.*, 26 I&N Dec. at 239. Finally, social distinction requires that "members of a society perceive those with the [group's shared] characteristic … as members of a social group; but literal, ocular visibility of the group is not determinative. *Orellana-Monson*, 685 F.3d at 519; *W-G-R-*, 26 I&N Dec. at 208; *M-E-V-G-*, 26 I&N Dec. at 247.

- 15 -

In this case, the respondent's proposed particular social group, "brother of disabled children," is not cognizable because it is over broad, lacks particularity and social distinction.. The group cannot be defined with particularity because the term "disabled" broadly encompasses a large spectrum of physical and mental health conditions. *Matter of W-G-R-*, 26 I&N Dec. 208, 214 (BIA 2014) (providing a proposed group cannot be "overbroad"); see, e.g., *Mendoza-Alvarez v. Holder*, 714 F.3d 1161, 1164 (9th Cir. 2013) (observing the group "all disabled persons" is not particular because it "include[s] large numbers of people with different conditions and in different circumstances") (cited as persuasive authority).

The respondent's testimony and evidence further do not reflect that brothers of disabled children possess fundamental identifying characteristics which cause them to be perceived as socially distinct within Russian society. *Matter of M-E-V-G-*, 26 I&N Dec. at 228, 240-41, 244 (noting that while ocular visibility is not required, the respondent must show the group is "set apart, or distinct, from other persons within the society in some significant way"); see also *Matter of A-R-C-G-*, 26 I&N Dec. at 394-95 (holding the issue of social distinction will depend on the facts and evidence in each individual case, including documented country conditions, the respondent's past experiences, and other reliable and credible sources of information).

The incidents involving Respondent's brother being disabled include the incidents at school as well as the incident on January 2021 involving Respondent's neighbor who is a police officer assaulting Respondent. As there is no protected ground due to Respondent being the brother of a disabled person, these incidents are not considered for consideration of persecution.

**b. Political Opinion**

Generally, an applicant's political opinion can be comprised of "an affirmative political belief." *Molina-Morales v. INS*, 237 F.3d 1048, 1051 (9th Cir. 2001). An applicant's political opinion may be one he actually holds or one that is imputed to him. *Matter of S-P-*, 21 I&N Dec. 486, 489-90 (BIA 1996). In order to demonstrate the requisite nexus between persecution and his political opinion, the applicant must prove that he holds a political opinion and "that the persecutors know of his political opinion and [have] or will likely persecute him because of it." *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 351 (5th Cir. 2002); *Gomez-Mejia v. INS*, 56 F.3d 700, 701 (5th Cir. 1995) (denying relief for an applicant whose persecutors were unaware of his alleged political opinion). To determine the persecutor's motivation in a political opinion claim, the Court must examine the record "for direct or circumstantial evidence from which it would be reasonable to conclude that those who threatened or harmed the [applicant] were in part motivated by an assumption that [his] political views were antithetical to their cause." *Matter of T-M-B-*, 21 I&N Dec. 775, 778 (BIA 1997). Further, persecution on account of political opinion must be due to the victim's political opinion, not that of the persecutors. *See INA v. Elias-Zacarias*, 502 U.S. 478, 482 (1992).

Here, Respondent claims that he was persecuted on account of his political opinion. Exh. 2 at 12. Respondent did not testify to being a member of any particular opposition group, but did

- 16 -

testify that he was opposed to the Russian involvement in the war in Ukraine and he was supportive of the Russian opposition leader Alexei Navalny (prior to his passing). Ex. 7 at 8. Respondent participated in one protest in Russia at the end of January 2021 during which he was detained, struck three times with a baton, and had his hands twisted. He was held overnight with no food, water, or toilet, and was released the next morning between 7 and 8 a.m. Respondent provided no testimony that he organized or attended meetings, recruited new members, or spoke publicly. He indicated that he reposted on his social media network one of his mother's posts about the abuse of power by police officers in which she talked about the situation with her other son who was disabled and about Respondent's detention, and how the police refused to help protect their basic human rights. This post was not submitted in evidence as Respondent indicated his page was blocked after making the post. He did not indicate why he could not have retrieved the post from his mother's page.

Respondent then indicated that in July 2021 that he was taken again to the local police department where he was beaten with hands and fists and told who was he to criticize the authorities, and that the police were aware of his prior detention from the protest supporting Navalny in January 2021. Respondent was then threatened if he wee to speak out against the police and the authorities, the officer, Ramis Akhmadullin, would come back for him and put him in prison for a long time. Respondent was held another day, and then released. Respondent left Russi for the Czech Republic on August 23, 2021, and has not returned to Russia.

Respondent testified to participating in two protests supporting Ukraine on in February 2022 and on March 6, 2022, with both being in the Czech Republic. While Respondent has nothing to demonstrate that he actually participated in these protests, the Court will accept his testimony as being sufficiently credible. However, the testimony and evidence did not sufficiently demonstrate that the Russian authorities were aware of Respondent's participation or could reasonably discover his participation. Respondent claimed he could be discovered because suspicious people were filming the faces of protestors, but the Court does not find this testimony sufficiently persuasive or believable. The Court also does not find sufficiently persuasive or believable that Respond transferred money to help the Ukrainian refugees by sending $5.00 and other amounts. Respondent was a student, only worked part-time, and said he was sending money home to his mother to help her. The Respondent provided a copy of his credit card, but not the transactions he said he made, which the Court finds were reasonably available to him.

Respondent also claims to have spoke out against the war in Ukraine through social networks, mainly Instagram, but did not submit any evidence to demonstrate this Instagram posts. The Court does not find Respondent's testimony or statement sufficiently persuasive or believable.

In considering the record as a whole, the Court finds that while the record does not sufficiently suggest that Respondent's political opinion based on his actions in the Czech Republic were known to the authorities in Russia, his actions prior to leaving Russia were sufficient to demonstrate an oppositionist opinion to the local authorities of Russia, and that the

- 17 -

harm he suffered in Russia was at least one central reason for the harm he endured from the local police when struck while participating in a protest and when detained. Based on the direct and circumstantial evident, the record, however, does not sufficiently demonstrate that the local authorities are seeking the Respondent due to his political opinion; rather, it supports that he is being sought due to him having been summoned to the military for conscription.

### 4. Persecution

The Court next looks to whether the past harm to Respondent rises to the level of persecution. Respondent is required to demonstrate either past persecution or a well-founded fear of future persecution. See 8 C.F.R. § 1208.13(b). At least one central reason for the persecution must be on account of the applicant's race, religion, nationality, membership in a particular social group, or political opinion. INA sec. 101(a)(42)(A). See INA § 208(b)(1)(B)(i); *Matter of J-B-N & S-M*, 24 I&N Dec. 208, 214 (BIA 2007). "[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be incidental, tangential, superficial, or subordinate to another reason for harm." *Cabrera v. Sessions*, 890 F.3d 153, 159 (5th Cir. 2018) (quoting *Sealed Petitioner v. Sealed Respondent*, 829 F.3d 379, 383 (5th Cir.2016)). Proving eligibility "does not automatically entitle a refugee to asylum." *Chen v. Gonzales*, 470 F.3d 1131, 1135 (5th Cir. 2006). But, asylum may be granted in the exercise of discretion of the Court if the applicant is eligible. INA sec. 208(b)(1)(A); *INS v Cardoza-Fonseca*, 480 US 421 (1987).

### 1. Past Persecution

Persecution exists where the noncitizen possesses an immutable belief or characteristic that a persecutor seeks to overcome; the persecutor could become aware of the trait or belief; the persecutor has the capability to punish the noncitizen; and the persecutor has the inclination to punish the noncitizen. *Matter of Acosta*, 19 I&N dec. 211, 212 (BIA 1985), modified on other grounds , *Matter of Mogharrabi*, 19 I&N Dec 439, 446 (BIA 1987). An applicant must produce evidence, either direct or circumstantial, for which it is reasonable to believe that the harm was motivated, in part by an actual or imputed ground. *Matter of F-T*, 21 I&N Dec. 486 (BIA 1996). As discussed *supra*, Respondent has demonstrated that he was harmed due to political opinion. This, however, does not mean the harm rises to the level of past persecution.

Persecution is a term that "does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." *Majd v. Gonzales*, 446 F.3d 590, 595 (5th Cir. 2006) (quoting *Al–Fara v. Gonzales*, 404 F.3d 733, 739 (3rd Cir. 2005)). Persecution requires more. It is generally defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a threat to life or freedom." *Morales v. Sessions*, 860 F.3d 812, 816 (5th Cir. 2017) (quoting *Fei Mei Cheng v. Att'y Gen. of U.S.*, 623 F.3d 175, 192 (3d Cir. 2010)).

Harm to some, even those subject to brutal physical attack, are not necessarily victims of "persecution." Courts have condemned all manner of egregious and even violent behavior while concluding they do not amount to persecution. See, e.g., *Singh v. Barr*, No. 19-60150, 2020 WL 3407167, at *3 (5th Cir. June 19, 2020) (per curiam) (no persecution when an individual was twice

- 18 -

beaten, including once until unconscious and resulting in a swollen shoulder and legs); *Venturini v. Mukasey*, 272 F. App'x 397, 402–03 (5th Cir. 2008) (per curiam) (no persecution when an individual was beaten twice and hospitalized for bruises, a broken rib, trouble breathing from tear gas, and overnight hospitalization); *Rojas v. INS*, 937 F.2d 186, 188 (5th Cir. 1991) (per curiam) (no persecution when an individual was "arrested, beaten, and tortured"); see also *Reyes-Morales v. Gonzales*, 435 F.3d 937, 942 (8th Cir. 2006) (no persecution when an individual was beaten unconscious and left with "a physical deformity and several scars" while his "friend was killed during this incident"); *Dandan v. Ashcroft*, 339 F.3d 567, 573–74 (7th Cir. 2003) (no persecution when an individual was kidnapped, detained for three days without food, and extensively beaten, resulting in facial swelling); *Gill v. Barr*, 765 F. App'x 225, 225 (9th Cir. 2019) (per curiam) (no persecution where a member of a minority political party was beaten and threatened with death); *see also, Eduard v. Ashcroft*, 279 F.3d 182, 188 (5ᵗʰ Cir. 2004) ("Neither discrimination nor harassment ordinarily amounts to persecution ... even if the conduct amounts to 'morally reprehensible' discrimination").

In this case, the testimony and evidence did not sufficiently demonstrate that Respondent suffered past persecution. The taunts and altercations involving school mates were related to Respondent having a disabled brother, which as discussed previously the Court finds is not a protected ground. While the police did not intervene when requested by Respondent's mother, the testimony and evidence demonstrated that it was due to the school mate's age and not for any other central reason.

Respondent was harmed once by a neighbor who was a police officer, and then he and his mother were threatened by a police officer when Respondent's mother tried to file a complaint on the neighbor who was a police officer. This harm was due to a dispute between the neighbor and the Respondent when the Respondent asked the neighbor, who happened to be a police officer, not to park where he was parking. There was insufficient evidence to indicate that the beating to Respondent was related to a protected ground.

The harm Respondent sustained related to his participation in a political rally was due to a protected ground as was the harm to Respondent when the Respondent was later taken and detained a few months after Respondent reposted on his page a social media post made by his mother who addressed issues involving her disabled son as well as Respondent's treatment related to the protest in January 2021. The Respondent sustained no further harm in Russia.[2]

In this case, the Court considers the harm in totality so long at the incident and/or threats are related to the protected ground of political opinion. As discussed *infra*, the only incidents related to a protected ground include Respondent being harmed while attending a political rally, and being detained and beaten in July 2021. The Respondent seeks to elevate the harm sustained to persecution by claiming it caused him a contusions, head concussion, nightmares, sleep disorders, heart problems, and vision deterioration. There was insufficient medical evidence to corroborate Respondent's claims of heart problems and vision deterioration being a result of either of the two

---

[2] Respondent did have two altercations in the Czech Republic, but they involved individuals from the Czech Republic and Ukraine, and there was no involvement by Russian authorities.

- 19 -

incidents, and Respondent's claims are not corroborated, are not persuasive, and do not ring true. As to the nightmares and sleep disorders this also lacks corroboration other than the first night Respondent was returned home after his detention, and is not sufficiently demonstrated by the testimony and evidence to be ongoing or severe in nature. The Court does not find the harm rises to the level of persecution. Accordingly, when considering these incidents, the Court does not find it rises to the level of past persecution.  In considering the harm, the Court does not find the harm to Respondent rises to the level of past persecution in this case.

### 2. Well-Founded Fear of Future Persecution

The Court next considers Respondent's claim of a well-founded fear of future persecution.  An applicant who fails to present a credible basis for a claim of past persecution may nevertheless prevail on a theory of future persecution. 8 CFR § 1208.13(b)(2).  As the Respondent in this case has not demonstrated that he suffered past persecution, he is not entitled to a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R. § 1208.13(b)(1).  Thus, Respondent has the burden of proof to establish the well-founded fear of persecution was or will be on account of a protected ground. See INA §§ 101(a)(42)(A), 208(b)(1)(B)(i).

A well-founded fear includes Respondent demonstrating that (1) he has a genuine, subjective fear of future persecution, (2) the subjective fear held by Respondent is objectively reasonable, and (3) the subjective fear has a nexus to a protected ground. *Edward v. Ashcroft, 324 F.3d 830, 833* (5th Cir. 2023) (citing *Cabrera v Sessions*, 890 F.3d 153, 159-60 (5th Cir. 2018)).    The non-citizen's subjective mental state must be considered against the background of the circumstances prevailing in the non-citizen's home country, and the applicant must demonstrate a genuine apprehension or awareness of the risk of persecution. See *Matter of Acosta*, 19 I&N Dec. at 221. An applicant may establish a well-founded fear of future persecution if he can show that he would be singled out individually for persecution, or if there is a "pattern or practice" of persecution of "similarly situated" persons. 8 CRF § 208.13(b)(2)(iii).

### a. Subjective Fear

In this case, the testimony and evidence sufficiently demonstrated that Respondent has a subjective fear of being imprisoned in the future if he is returned to Russia. These fears are that, if returned, Respondent will be imprisoned because he opposes the Russian regime and the war in Ukraine and because he fears being conscripted into the Russian military.

As previously discussed, Respondent's political opinion is a protected ground.  As to political opinion, although the past persecution does not rise to the level of persecution, the Court shall accept the Respondent's statements of future fear, which the Court finds is genuine, and is based on credible testimony and the evidence in the record. *Chen v. Gonzales*, 470 F.3d 1131, 1135 (5th Cir. 2006).

As to conscription, the BIA has previously held that punishment or threat of punishment for this is not a form of persecution directed at someone on account of political belief. *Oloson v. INS*, 51 F.3d 1045 (5th Cir. 1995) (cite omitted).  As conscription is not a protected ground, it shall be addressed under CAT.

**b. Objectively Reasonable**

The Court next considers whether the fears are objectively reasonable. This component is met if there is a reasonable possibility the applicant will suffer persecution. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). This requires less proof than the clear probability standard. *Guevaru Flores v. INS*, 786 F.2d 1242, 1249 (5th Cir. 1986). Would a reasonable person in the applicant's circumstance fear persecution if he were returned to his native country. *Guevaru Flores*, 786 F.2d at 1249. To establish the objective reasonableness of a well-founded fear of persecution, an applicant must prove:

1. That he/she possesses a belief or characteristic a persecutor seeks to overcome by means of punishment of some sort;
2. That the persecutor is already aware, or could become aware, that the applicant possesses this belief or characteristic;
3. That the persecutor has the inclination to punish the applicant; and
4. That the persecutor has the capability of punishing the applicant.

*Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005)( internal citation omitted). The objective component requires a showing by credible, direct, and specific evidence in the record that the alien's fear of persecution is reasonable.

While Respondent has subjective fears, the Court finds that the Respondent's fears are not objectively reasonable. In the past, Respondent was involved in two protests in Russia for which he sustained harm that does not rise to the level of persecution. While the record demonstrates that the Russian authorities may be seeking the Respondent related to conscription, the record does not sufficiently demonstrate that the Russian authorities are seeking the Respondent related to his political opinion.

Respondent fears being harmed or facing criminal charges if he were to continue in his political activities or protests. Further, the Respondent's fears are nonspecific and lack in immediacy. Although the respondent asserts that he believes the Russian government is aware of his anti-war stance, in this case the testimony and evidence is insufficient that the Russian government remains interested in Respondent related to his participation in past protests or reposting his mother's social medical post. Further, Respondent's mother was not detained or interrogated concerning her opposition posts, which weighs against Respondent's claim that he would be harmed in the future. Much of Respondent's fears of the authorities knowing of his activities are based on speculation and are not sufficiently demonstrated by the testimony and evidence.

Further, the Court does not finds the testimony and evidence sufficiently demonstrate that he reposted his mother's post was engaging on online activity that was critical to the Russian regime or supporting the war in Ukraine. The post concerned his mother's frustrations concerning her other son, who is disabled, and Respondent's treatment by the police while he was detained. This is not a political opinion. Further, the testimony and evidence was not sufficient to demonstrate that Respondent made any other posts critical of the Russian regime or supporting war in Ukraine or that Respondent's online activity of was discovered by the police. Respondent 's testimony and the testimony of his mother are not persuasive on this issue. Further, if it had been ongoing, Respondent's mother also would have been detained and interrogated by the police. Respondent

ROIR - 21 of 26

did not indicated that his mother was being targeted related to her actions of being critical of the police.

Further, with the Respondent did not sufficiently demonstrate that he made repeated contributions to support Ukraine. He provided proof of one $5.00 contribution to a Czech Republic fund that supports Ukraine made in February, 2022. Ex. 8 at 65. He also did not sufficiently demonstrate that the Russian authorities are currently aware or are likely to become aware of the contribution he made. Although Respondent indicated that he made more than one contribution, there is no corroborating evidence of such. If he had, documentation of the contributions would have been reasonably available to the Respondent. As a result, the Court gives Respondent's testimony that he made more than one contribution very little weight, and the evidence does not sufficiently demonstrate that he did. Further, the contribution was made well prior to the change in legislations, and there was no showing that Russian citizens are being targeted for that small of a contribution made prior to the enactment of the legislation, or Respondent would be singled out for any harm rising to the level of persecution if it were discovered.

Accordingly, considering the totality of the testimony and evidence, the Court finds the Respondent has not demonstrated that his fears are objectively reasonable.

**INTERNAL RELOCATION**

Additionally, a well-founded fear is negated if the applicant can avoid persecution by relocating to another part of his home country, if under all circumstances it would be reasonable to expect the applicant to do so. *Edward v Ashcroft*, 379 F.3d 182, 189 (5th Cir. 2005) (citing 8 CFR sec. 208(b)(2)(ii)). When there is no showing of past persecution, the applicant bears the burden to establish that relocation is unreasonable, unless the persecution is by a government or is government sponsored. *Id.* at 194 (citing 8 CFR sec. 208.13(b)(3)(i)). If the government is the feared persecutor, DHS must rebut the presumption of the government's willingness and ability to persecute an individual anywhere within its jurisdiction, and establish by a preponderance of the evidence that under the circumstances, relocation is reasonable. 8 CFR § 1208.13(b)(3)(ii). If the Court had found a well-founded fear, the Court would have found that the government is the feared persecutor. In this case, there was insufficient testimony and evidence to demonstrate that Respondent could not relocate elsewhere to avoid the local officials. As such, DHS did not rebut the presumption to demonstrate that the Respondent could relocate elsewhere, and thus there was sufficient evidence presented to establish that internal relocation was reasonable

**GOVERNMENT UNABLE OR UNWILLING TO CONTROL**

Respondent must demonstrate that his future persecution would be committed by the Russian government, or by forces the government is unable or unwilling to control. The testimony and evidence in the record demonstrates that the Russian authorities would be involved in any future harm (if it rose to the level of persecution), and therefore the Court finds that this factor has been established.

**DISCRETION**

The Respondent has applied for a discretionary form of relief, and the Respondent bears the burden to prove for asylum that he merits the Court's discretion. See INY sec. 208(b)(1)(A); see also INS v. Cardoza-Fonseca, 480 US 421, 428 n. 5 (1987). In determining whether a favorable exercise of discretion is warranted, both favorable and adverse factors should be considered, as well as the totality of the circumstances. See Matter of Pula, 19 I&N Dec. 467 (BIA 1987). The Court considers certain factors such as the circumstances and actions of the applicant in his flight from the country where he fears persecution and general humanitarian conditions such as age, health, and family ties in the U.S.

In this case, Respondent has no family who have any legal status in the United States; he has only been in the United States a short period of time. His mother and brother are here seeking asylum. Upon a balancing of the factors, and in view of the totality of the circumstances, the positive factors outweigh the negatives, and asylum would be granted in the Court's exercise of discretion if Respondent were eligible for asylum.

Accordingly, the Respondent's application for asylum is denied.

### 5. Withholding of Removal pursuant to INA § 241(b)(3)

To be eligible for withholding of removal, the applicant must establish a clear probability that his life or freedom would be threatened on account of a protected ground. INA § 241(b)(3); 8 C.F.R. § 1208.16(b); I.N.S. v. Stevic, 467 U.S. 407, 42930 (1984); Roy v Ashcroft, 389 F.3d 132, 138 (5th Cir. 2004) (citation omitted). "Clear probability" is a higher standard than the "well-founded fear" standard that applies to claims for asylum. See Matter of R-O, 20 I&N Dec. 455 (BIA 1992). As Respondent has failed to meet the lower standard of proof for an asylum claim, the Court finds that he has not met the higher, clear probability, standard of proof for a claim of withholding of removal under the Act. Efe v. Ashcroft, 239 F.3d 899, 906 (5th Cir. 2002). Therefore, Respondent's application for withholding of removal is denied.

### 6. WITHHOLDING OF REMOVAL UNDER THE CONVENTION AGAINST TORTURE

Torture is "an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment." Id. § 1208.18(a)(2). "Torture includes only pain or suffering inflicted by or with the consent or acquiescence of a public official or other person acting in an official capacity." Quorane v. Barr, 919, F.3d 904, 911 (5th Cir. 2019), cert den.; § 1208.18(a)(2). Protection against Torture is mandatory relief if the requirements are met. 8 CFR 1208.16(c), 1208.18. To be eligible for relief under the Convention against Torture a Respondent must show "that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 CFR 1208.16(c)(2).. Unlike persecution, torture "does not require a nexus to specific statutory grounds." Tamara-Gomez, 447 F.3d at 350; see also 8 C.F.R. § 1208.18(a)(1) (stating that torture may be inflicted "for any reason based on discrimination of any kind"). Protected grounds are not considered.

In assessing whether it is more likely than not that an applicant would be tortured in the

proposed county of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to, (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; (3) evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal. 8 CFR sec. 1208.16(c) (3). Torture does not include pain or suffering arising from or incidental to lawful sanctions unless the sanctions defeat the purpose of CAT. 8 C.F.R. § 1208.18(a)(1); § 1208.18(a)(3). As with asylum and withholding of removal, the Respondent bears the burden of proof. *Id.* §1208.16(c)(2). However, relief under CAT does not require a nexus to a specific protected ground. *Tamara-Gomez v. Gonzales*, 447 F.3d 343, 350 (5th Cir. 2006). Instead relief under CAT first requires an analysis of whether it is more likely than not that the applicant will be tortured upon return to his homeland; and second, whether there is sufficient state action involved in that torture. *Iruegas-Valdez v. Yates*, 846 F.3d 806, 812 (5th Cir. 2017) (cite omitted). Additionally, an applicant seeking protection under CAT must allege specific facts showing that he will personally be at risk of torture. *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). The mere existence of a pattern of human rights violations in a country does not constitute sufficient ground for finding that a particular person would more likely than not be tortured. *S-V-*, 22 I&N at 1313. Torture under CAT does not simply refer to general violence in the country of nationality. *Matter of S-V-*, 22 I&N Dec. 1306, 1313 (BIA 2000). "Generalized county evidence tells us little about the likelihood state actors will torture any particular person." *Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019) (citing *Chen v. Gonzales*, 470 F.3d 1131, 1140-41 (5th Cir. 2006); see also *Morales v. Sessons*, 860 F.3d 812, 818 (5th Cir. 2017) (country conditions evidence was too general to warrant CAT relief).

The courts have long held that it is not persecution for a country to require military service of its citizens unless the punishment for evading military service would be disproportionate and severe, or that he would be required to participate in inhumane conduct. See *Milat v. Holder*, 755 F.3d 354, 362-63 (5th Cir. 2014). "[W]here there is evidence of legitimate prosecutorial purpose, foreign authorities enjoy much latitude in vigorously enforcing their laws." *Singh v. Gonzales*, 439 F.3d 1100, 1112 (9th Cir. 2006), overruled on other grounds by *Maldonado v. Holder*, 786 F.3d 1155, 1162-63 (9th Cir. 2015). Further, ordinary prosecution for criminal activity is generally not persecution. See *Abedini v. INS*, 971 F.2d 188, 191092 (9th Cir. 1992) (punishment for distribution of Western videos and films; use false passport, and avoidance of conscription in Iran). Further, being conscripted into the military is generally not persecution. *Gebregergish v. Holder*, 538 F.App' 582, 583 (5th Cir. 2013); see *Paz-Caballero v. INS*, 47 F.3d 427 n. 2 (5th Cir. Feb 2, 2005) (unpublished) "conscription without more is not persecution under the [INA].").

Maintaining discipline within a military organization is a necessary means of achieving a political goal. ) ("The INS has long recognized … that the normal enforcement of selective service laws in not 'persecution' within the meaning of the statute even if the draftee's motive is political."). A respondent may establish a well-founded fear of future persecution if " he would face disproportionate and severe punishment for refusing to serve on account of a protected ground, or that military service will necessarily require the applicant to participate in inhumane conduct." *Milat v. Holder*, 755 F.3d 354, 362 (5th Cir. 2014); see also, *Arbabian v. INS*, 995 F.2d 222, n. 1 (5th Cir. 1993) (unpublished) (explaining that prosecution for failure to perform compulsory is not persecution unless the applicant shows either (1) the penalty imposed would be

disproportionately severe on account of a protected ground, or (2) the applicant would be required to engage in inhumane conduct as part of military service) ; *INS v. Elias-Zacarias*, 502 U.S. 478, 481-82 (1992) (explaining that, in the context of attempted conscription, a respondent has to establish that he has a well-founded fear of being persecuted on account of his political opinion rather than because of his refusal to fight with his alleged persecutors).

The Court observes that the reasonableness of a non-citizen's fear can be based on what has happened to others similarly situated, as reported in the current country reports (U.S. Dept of State Country Reports of Human Rights Practices), or other reliable sources. See 8 CFR sec 1208.12(a); see *Matter of Exame*, 18 I&N Dec. 303, 304-5 (BIA 1982). Respondent submitted various articles and human rights report to support his contention that he would be tortured if returned to Russia. See Ex. 6. Respondent's expert also testified and gave a report indicating that Respondent would be tortured if he were returned to Russia. Ex. 3. The Court finds that Respondent sufficiently demonstrated by the testimony and evidence is that enlistment officers came to Respondent's mother's home trying to locate the Respondent to serve a summons. Local police officers followed up trying to locate the Respondent, and one contacted Respondent's mother on December 5, 2023 seeking information about Respondent. The expert testimony, country condition reports and articles sufficiently demonstrate at this time that the use of torture by the government for failure to report is a problem. The Russian constitution prohibits torture and other cruel, inhuman, or degrading treatment or punishment, but there were credible reports of law enforcement engaging in torture, abuse, and violence to coerce confessions from suspects, and the Russian authorities generally did not hold officials accountable for such actions. Ex. 3 & 6. Because the government is the actor, respondent cannot relocate within Russia as explained by the expert witness. The government has residency and migration records, and one cannot relocate in Russia without the government's permission. Also, if the Respondent is returned to Russia, the government will be aware he has returned, and there exists ongoing gross flagrant, or mass violations of human rights within Russia, and the government has a systemic practice of degrading treatment and punishment of its prisoners, of which Respondent would be if he were imprisoned on his return and refused to conscript into the military. In addition to the significant human rights abuses committed by Russia in relation to its invasion of Ukraine, there also are significant human rights issues including pervasive torture by government law enforcement officers that sometimes resulted in death and occasionally involved sexual violence or punitive psychiatric incarceration; harsh and life-threatening conditions in prisons; arbitrary arrest and detention; political and religious prisoners and detainees; transnational repression against individuals located outside the country; and crimes involving violence or threats of violence targeting members of ethnic and religious minority groups. The government failed to take adequate steps to identify, investigate, prosecute, or punish most officials who committed abuses and engaged in corruption, resulting in a climate of impunity. Ex. 6. Further, although the Russian constitution prohibits such practices, numerous credible reports indicated law enforcement officers engaged in torture, abuse, and violence to coerce confessions from suspects, and authorities only occasionally held officials accountable for such actions. *Id.* The expert witness, Igor Kilgore, also provided additional evidence and testimony concerning torture by Russian government officials toward prisoners and others. Ex. 3.

Given the absence of the rule of law, an ineffective judiciary, harsh prison conditions and the government's routine use of torture against prisoners, as discussed in the country condition evidences and by the expert witness, and for the above-mentioned foregoing reasons, the Court

- 25 -

finds that the testimony and evidence in the record is sufficient to meet the burden of establishing that it is more likely than not that the Respondent would be tortured in Russia by, or at the instigation of, or with the consent or acquiescence of a public official or other person acting in an official capacity. As such, the Court will grant Respondent's application for protection under CAT. *See* 8 C.F.R. § 1208.16(c).

Accordingly, the following orders shall be entered:

ORDERS:

IT IS ORDERED that Respondent's application for asylum pursuant to INA sec. 208 is **DENIED**.

IT IS ORDERED that withholding of removal pursuant to INA § 241(b)(3) is **DENIED**.

IT IS FURTHER ORDERED that Respondent be **REMOVED** from the United States to RUSSIA in accordance with the charges contained within the Notice to Appear.

IT IS FURTHER ORDERED that Respondent's application for withholding of removal pursuant to the Convention Against Torture as set forth in section 1208.16(c ) of Title 8 of the Code of Federal Regulations is **GRANTED**.

| | |
|---|---|
| _____9/30/2024_____ | /s/ Tanya Hasbrouck |
| Date | Tanya Hasbrouck |
| | U.S. Immigration Judge |
| | LaSalle Immigration Court |

## APPEAL RIGHTS

Both parties have the right to appeal the decision in this case. Any appeal is due at the Board of Immigration Appeals on or before 30 calendar days from the date this decision is signed.

## CERTIFICATE OF SERVICE

THIS DOCUMENT WAS SERVED BY: MAIL (M) PERSONAL SERVICE (P)

TO: ALIEN ( ) ALIEN C/O CUSTODIAN ( ) ALIEN'S ATTY/REP ( ) DHS ( )

DATE: _____ BY: COURT STAFF _____

ATTACHMENTS: ☐ EOIR-33  ☐ EOIR-28  ☐ LEGAL SERVICES LIST ☐ OTHER _____

## Exhibit H Formal Request to ICE Sacramento Field Office

05.04.2025, 16:37                                     Gmail - Formal Request for GPS Bracelet Removal

 **Gmail**                                    Mark Beliaev <marktv295@gmail.com>

### Formal Request for GPS Bracelet Removal
1 message

**Mark Beliaev** <marktv295@gmail.com>                          Wed, Mar 12, 2025 at 4:57 PM
To: Sacramento.Outreach@ice.dhs.gov

Dear Officer/ICE Supervisor,

I am writing to formally request the removal of my **GPS monitoring bracelet** that was placed on me as part of my release conditions. My **A-Number is 249 274 299**, and I was released from ICE custody on **12.13.2024** after being granted **withholding of removal under the Convention Against Torture (CAT)**.

Since my release, I have complied with all ICE check-ins and requirements. To the best of my knowledge:

- I have **not violated any conditions of my release**.
- I have **remained in compliance with all immigration reporting requirements**.
- I have **maintained a stable residence** at 3416 Lerwick Rd,Sacramento.
- My status does not require further electronic monitoring.

Given my continued compliance and **the hardship the GPS bracelet causes**, including physical discomfort, difficulty with daily activities, and potential employment challenges, I respectfully request that ICE review my case and consider removing the monitoring device.

I am willing to appear in person for any necessary review or provide additional documentation upon request. Please let me know if there are any specific forms or procedures I must follow to facilitate this request.

Thank you for your time and consideration. I appreciate your prompt attention to this matter and look forward to your response.

Sincerely,
Mark Beliaev
A249274299

2792658517

**Exhibit I**

# Formal Request to ICE San Francisco Field Office

05.04.2025, 16:37                    Gmail - Formal Request for GPS Bracelet Removal – A249274299

 Gmail                              Mark Beliaev <marktv295@gmail.com>

**Formal Request for GPS Bracelet Removal – A249274299**
1 message

**Mark Beliaev** <marktv295@gmail.com>                    Wed, Mar 12, 2025 at 4:51 PM
To: SanFrancisco.Outreach@ice.dhs.gov

Dear Officer/ICE Supervisor,

I am writing to formally request the removal of my **GPS monitoring bracelet** that was placed on me as part of my release conditions. My **A-Number is 249274299**, and I was released from ICE custody on **12.13.2024** after being granted **withholding of removal under the Convention Against Torture (CAT)**.

Since my release, I have complied with all ICE check-ins and requirements. To the best of my knowledge:

- I have **not violated any conditions of my release**.
- I have **remained in compliance with all immigration reporting requirements**.
- I have **maintained a stable residence** at 3416 Lerwick Rd, Sacramento.
- My status does not require further electronic monitoring.

Given my continued compliance and the **hardship the GPS bracelet causes**, including physical discomfort, difficulty with daily activities, and potential employment challenges, I respectfully request that ICE review my case and consider removing the monitoring device.

I am willing to appear in person for any necessary review or provide additional documentation upon request. Please let me know if there are any specific forms or procedures I must follow to facilitate this request.

Thank you for your time and consideration. I appreciate your prompt attention to this matter and look forward to your response.

Sincerely,
Mark Beliaev
A-249274299
2792658517

**Exhibit J**

# CRCL Complaints (Online and Mailed)

12.03.2025, 10:24                    Confirmation - DHS Civil Rights and Civil Liberties Complaint

## Confirmation Number WP–003208
2025-03-12 17:24:14

### Person who experienced the alleged civil rights or civil liberties violation

**First Name**
Mark

**Last Name**
Beliaev

**Cell Phone Number**
2792658517

**Home Phone Number**

**Work Phone Number**

**Date Of Birth**
2002-03-11

**A-Number**
249274299

**Currently In Detention**
false

**Preferred Language**
English

**Email Address**
marktv295@gmail.com

**Mailing Address**
3416 Lerwick Rd

**City**
Sacramento

**State**
California

**Zip**
95821

**Country**

**Represented By Attorney**
false

# Confirmation Number WP–003208

2025-03-12 17:24:14

## Who the complaint is about

### Who is this about

- Immigration and Customs Enforcement (ICE)

12.03.2025, 10:24                                        Confirmation - DHS Civil Rights and Civil Liberties Complaint

# Confirmation Number WP–003208

2025-03-12 17:24:14

---

### When and where the incident/situation happened

**When the incident/situation happened**
That happend today on 03.12.2025. ICE officer Smith refused to remove my GPS bracelet in impolite way regardless my Withholding of removal under Convention against torture status.

**Where the incident/situation happened**

**Place**
650 Capitol mall

**City**
Sacramento

**State or Country**
California

# Confirmation Number WP-003208

2025-03-12 17:24:14

### What happened

**The details of the complaint**

I had an appointment with ICE on March 12 2025. ICE officer Smith refused me in impolite way he said: " I dont care what told you another officer on your last appointment" and refused to provide a written explanation as well. Here are the key rights that ICE may have violated by refusing to remove your GPS monitor despite my withholding of removal under CAT: Fifth Amendment – Due Process Violation The government cannot impose arbitrary restrictions on my liberty without due process. ICE's refusal to remove the GPS monitor lacks justification, effectively placing me under continued surveillance and restriction without legal basis. Eighth Amendment – Cruel and Unusual Punishment (Potential Argument) While typically applied to criminal cases, continued GPS monitoring could be considered excessive and punitive given that I am not under removal proceedings and cannot be deported. 8 U.S.C. § 1231(a)(3) & 8 C.F.R. § 241.4 – Limits on Supervision Conditions These laws allow ICE to impose reasonable conditions on release but not arbitrary or excessive ones. Since I am not deportable, ongoing GPS monitoring serves no legitimate immigration enforcement purpose. Violation of Court-Granted Protection Under CAT The judge's order granting withholding of removal protects me from deportation. ICE's refusal to remove the GPS monitor defies the spirit of this protection, treating me as if I am still under active deportation proceedings. Fourth Amendment – Unreasonable Search and Seizure (Possible Claim) Continuous GPS tracking without cause could be challenged as an unreasonable form of surveillance.

# Confirmation Number WP–003208

2025-03-12 17:24:14

---

### People who witnessed the incident/situation

**Witness One**

**Name**

**Mailing Address**

**City**

**State**

**Zip**

**Phone**

**Email Address**

**Witness Two**

**Name**

**Mailing Address**

**City**

**State**

**Zip**

**Phone**

**Email Address**

# Confirmation Number WP-003208

2025-03-12 17:24:14

---

### Other agency, office, or court that has been contacted about this complaint

**Have you contacted any other DHS component or other federal, state, or local government agency or court about this complaint?**
No

**Agency/Office/Court**

**Date**

**If so, has anyone responded to your complaint**
No

**If Yes, describe what has been done to respond to your complaint**

# Confirmation Number WP-003208

2025-03-12 17:24:14

## Other information you want CRCL to know or consider

**The other information you want CRCL to know or consider**

**Mark Beliaev**
3416 Lerwick Rd, Sacramento, California 95821
2792658517
marktv295@gmail.com
03.12.2025

U.S. Department of Homeland Security
Office for Civil Rights and Civil Liberties
Compliance Branch, Mail Stop # 0190
2707 Martin Luther King, Jr. Ave., SE
Washington, DC 20528-0190

**Subject: Complaint Regarding ICE GPS Monitoring and Civil Rights Violations**

To Whom It May Concern,

I am writing to formally request the intervention of the Office for Civil Rights and Civil Liberties (CRCL) regarding my ongoing issue with U.S. Immigration and Customs Enforcement (ICE) and the continued requirement to wear a GPS monitoring bracelet.

I was granted **withholding of removal under the Convention Against Torture** and released from ICE custody on **December 13, 2024**. Despite this legal protection and my full compliance with all requirements, ICE has continued to subject me to unnecessary and prolonged electronic monitoring through a GPS ankle bracelet. This condition has caused significant physical discomfort, mental distress, and unnecessary restrictions on my daily life.

Today, on **March 12, 2025**, I attended an appointment with ICE regarding the removal of the GPS bracelet. However, **Officer Smith** refused to remove the device in an impolite and dismissive manner. When I asked for a written explanation regarding the decision, the officer **declined to provide any documentation** or justification for continuing this restriction. This lack of transparency and due process has left me without recourse and raises serious concerns about the arbitrary nature of ICE's decision-making.

I respectfully request that CRCL review my case and investigate whether the continued use of this GPS bracelet is a violation of my civil rights. Additionally, I urge your office to look into ICE's conduct regarding the lack of written explanations for these decisions, as this creates an undue burden on individuals like myself who are complying with all legal obligations.

Please confirm receipt of this complaint and inform me of the next steps in the review process. I am available to provide any additional documentation or information as needed.

Thank you for your time and attention to this matter. I look forward to your response.

Sincerely,

Mark Beliaev

## EXHIBIT K

Affidavit of Mark Beliaev

Affidavit

To whom it may concern,

My name is Mark Beliaev. I am 22 years old, and I came to the United States to seek asylum when I was 20. Unfortunately, the unfair judicial system in Louisiana took almost two years of my life. I crossed the border on September 20, 2023, with my mother and disabled brother, who has epilepsy and uses a wheelchair. On that day, the CBP officers displayed extreme rudeness and disrespect. I was separated from my family, including my brother with special needs, and was eventually detained. Medical staff refused to provide my brother, Matvei Puliaev, with critical medications. As a result, he spent two days at the border without the medical assistance he urgently needed.

My mother, Elena Puliaeva, is 46 years old and struggles to care for my brother alone due to his disability and his physical condition, which makes him difficult to lift without assistance. She pleaded with a CBP supervisor to release me and begged on her knees twice, but he ignored her and appeared irritated. A CBP officer named Kim threatened me with his baton, saying he would use it if I didn't comply with being taken to a holding cell. He also cursed at me and my family.

After two days at the border, my family was released, but I was detained because of my age—20 years old, as I was told. I believe the CBP officers could have released me but chose not to due to discriminatory and prejudiced attitudes toward Russian passport holders.

On September 26, I was transferred to Adams Mississippi Correctional Center, where I spent nearly three months. On November 30, my 21st birthday, I received positive results from my credible fear interview. On December 13, I was transferred to Jena LaSalle Detention Facility in Louisiana.

At Jena LaSalle Detention Facility, I spent 12 months. ICE officers refused to release me on parole four times without providing any reasons. The only option given to me was to go through all immigration proceedings while in detention.

In February 2024, I attended my first master hearing with Immigration Judge Tanya Hasbrouck, where I submitted Form I-589. My individual hearing was scheduled for May 24, 2024. Despite having a court date, Judge Hasbrouck postponed making a decision on my case multiple times for reasons unknown to me. She rescheduled my hearing four times, leaving the decision pending in the automated case information system. This prolonged uncertainty was humiliating and felt prejudiced.

On June 17, 2024, my mother suffered a heart attack. She collapsed to the floor, enduring severe chest pain for 15 minutes before recovering. Thankfully, she survived, but she continues to need help with medical examinations and appointments. After this incident, I realized I could no longer endure the situation. On September 25, I contacted the UNHCR and filed a complaint against Judge Hasbrouck. On September 30, 2024, I was granted

withholding of removal under the Convention Against Torture. Although her written decision contained numerous mistakes, I chose not to appeal as I was desperate to be reunited with my family.

On December 13, 2024, I was released from Jena LaSalle Detention Facility and now live in Sacramento, California, with my family. ICE placed a GPS bracelet on my right ankle upon my release and has informed me that it will not be removed until at least March 12, 2025. This decision feels discriminatory and continues to instill fear and distrust toward ICE. Additionally, my research revealed that the U.S. government does not recognize my withholding status as a legal form of residency, leaving me feeling unsafe. My only remaining chance to obtain a green card is through my family, who are awaiting their final hearing.

In summary, I regretfully state that I have become a victim of the unfair U.S. justice system, like many other asylum seekers from Russia. I have always believed in the justice and constitutional protections of the United States. However, ICE's treatment of me and other Russian asylum seekers is unconstitutional and undermines those values.

Sincerely,

Mark Beliaev

Date: January 19, 2025

Signature: